Citation Nr: 1126170 
Decision Date: 07/12/11 Archive Date: 07/19/11

DOCKET NO. 04-32 725 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in St. Petersburg, Florida


THE ISSUES

1. Entitlement to service connection for an acquired psychiatric disorder, to include posttraumatic stress disorder (PTSD).

2. Entitlement to service connection for a right shoulder disorder.

3. Entitlement to service connection for a right foot disorder.

4. Entitlement to service connection for a disability manifested by numbness in the hands.

5. Entitlement to service connection for residuals of a concussion, claimed as traumatic brain injury (TBI), and including headaches.

6. Entitlement to a total disability rating based on individual unemployability (TDIU) due to service-connected disabilities.




ATTORNEY FOR THE BOARD

K. Osegueda, Associate Counsel


INTRODUCTION

The Veteran served on active duty from August 1969 to April 1973, with approximately 53 days of service in the Republic of Vietnam (RVN) from June to August 1970. 

This matter was initially before the Board of Veterans' Appeals (Board) on appeal from rating decisions by the Department of Veterans Affairs (VA) Regional Office (RO) in St. Petersburg, Florida.

In April 2007 the Board, in part, determined that new and material evidence had been received to reopen a previously denied claim for service connection for PTSD and remanded the underlying claim for entitlement to service connection for PTSD, along with the remaining issues listed on the title page, to the RO for further development. Among the other issues remanded was the Veteran's petition to reopen a claim of entitlement to service connection for a mental disorder, other than PTSD.

In Clemons v. Shinseki, 23 Vet. App. 1 (2009) the Court of Appeals for Veterans Claims held in part that a claim of service connection for PTSD may include any mental disability that may reasonably be encompassed by the claimant's description of the claim, reported symptoms, and the other information of record (in that case, diagnoses of chronic PTSD and depression). 

In light of Clemons, the Board has recharacterized the Veteran's claim as one of entitlement to service connection for an acquired psychiatric disorder, including PTSD. 38 C.F.R. § 19.35 (providing that certification is for administrative purposes and does not serve to either confer or deprive the Board of jurisdiction of an issue). 

In August 2010, the Board remanded all issues to the Appeals Management Center (AMC) in Washington, DC, so the Veteran could be scheduled for a requested Travel Board hearing in connection with his appeal.

Travel Board hearings are generally scheduled at VA ROs, where VA has adequate physical resources and personnel to support such hearings. The only RO in the State of Florida is in St. Petersburg. See 38 C.F.R. § 20.704(a) (2010). The Veteran was therefore scheduled for a Travel Board hearing in February 2011 at the St. Petersburg RO. He submitted correspondence dated in January 2011 indicating that it was inconvenient for him to attend the scheduled hearing at the St. Petersburg RO, and requested the RO schedule another hearing at the Orlando VA Medical Center. In relevant part, the Veteran did not request a rescheduling of the hearing, but instead stated that there was "no way possible" that he could attend the scheduled hearing in St. Petersburg because it was "too far and too confusing." He requested that the RO reschedule the hearing at the VA Medical Center in Orlando. 

The Veteran has not shown good cause for his request. The duty to assist in the development and adjudication of a claim is not a "one-way street." See Wood v. Derwinski, 1 Vet. App. 190, 193 (1991). Requests to change scheduled Travel Board hearings may be made at any time up to two weeks prior to the date of the hearing if good cause is shown. Examples of good cause include illness of the appellant, difficulty in obtaining necessary records, and unavailability of a necessary witness. See 38 C.F.R. § 20.704(c). 

However, the Veteran's essential contention is that attending the hearing as he requested and as was scheduled by the RO would pose an inconvenience to him. The Board finds that the Veteran's explanation of his inability to attend the hearing in St. Petersburg because it was "too far and too confusing" is inadequate for the good cause requirement under 38 C.F.R. § 20.704(c). Accordingly, the Veteran's request for a hearing is considered withdrawn. 38 C.F.R. § 20.704(e) (2010). The Board will therefore proceed with appellate consideration of the claim.

Additionally, after the current appeal was certified to the Board, the Veteran submitted statements in January 2011 and May 2011 that have not been reviewed by the RO; nor were the statements received with a waiver of initial RO consideration from the Veteran or his accredited representative. The law requires that evidence must be referred to the agency of original jurisdiction (AOJ) for review and preparation of a supplemental statement of the case (SSOC) unless this procedural right is waived in writing by the appellant. 38 C.F.R. §§ 19.37, 20.1304 (2010). 

However, the statements submitted by the Veteran were not submitted as evidence in an effort to support his claims on appeal; rather, they were, in large part, an explanation concerning his inability to attend a Travel Board hearing at the St. Petersburg RO, and requests and inquiries concerning VA neurology and psychiatric examinations. As discussed above, the Travel Board hearing request has been considered withdrawn.


FINDINGS OF FACT

1. All known and available service medical records have been obtained; the Veteran has been advised under the facts and circumstances of this case as to the evidence which would substantiate his claims for service connection and for TDIU; and he has otherwise been assisted in the development of his claims.

2. The Veteran's statements that he currently has an acquired psychiatric disorder which was caused by military service are not competent evidence.

5. The Veteran does not have an acquired psychiatric disorder as a result of any incident of active military service. 

6. The Veteran does not have a current right shoulder disability due to service.

7. The Veteran does not have a current right foot disability due to service.

8. The Veteran does not have a current disability manifested by numbness in the hands due to service.

9. The Veteran does not have TBI as a result of any incident of active military service.

10. The Veteran does not have current post-concussive headaches due to service.

11. The Veteran's service-connected low back disability, without regard to age or other disabilities, does not preclude him from obtaining and retaining all forms of substantially gainful employment.


CONCLUSIONS OF LAW

1. The criteria for the establishment of service connection for an acquired psychiatric disorder are not shown. 38 U.S.C.A. §§ 1131, 5103, 5103A, 5107 (West 2002); 38 C.F.R. §§ 3.102, 3.159. 3.303, 3.310 (2010).

3. The criteria for the establishment of service connection for a right shoulder disability are not shown. 38 U.S.C.A. §§ 1110, 1131, 5103A, 5107, 7104 (West 2002); 38 C.F.R. §§ 3.102, 3.303 (2010).

4. The criteria for the establishment of service connection for a right foot disability are not shown. 38 U.S.C.A. §§ 1110, 1131, 5103A, 5107, 7104 (West 2002); 38 C.F.R. §§ 3.102, 3.303 (2010).

5. The criteria for the establishment of service connection for a disability manifested by numbness in the hands are not shown. 38 U.S.C.A. §§ 1110, 1131, 5103A, 5107, 7104 (West 2002); 38 C.F.R. §§ 3.102, 3.303 (2010).

6. The criteria for the establishment of service connection for post-concussive headaches are not shown. 38 U.S.C.A. §§ 1110, 1131, 5103A, 5107, 7104 (West 2002); 38 C.F.R. §§ 3.102, 3.303 (2010).

7. The criteria for an award of TDIU are not met. 38 U.S.C.A. §§ 1155, 5107(b) (West 2002); 38 C.F.R. §§ 3.340, 3.341, 4.16(a)(b) (2010).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

In this decision, the Board will discuss the relevant law which it is required to apply. This includes statutes enacted by Congress and published in Title 38, United States Code ("38 U.S.C.A."); regulations promulgated by VA under the law and published in the Title 38 of the Code of Federal Regulations ("38 C.F.R.") and the precedential rulings of the Court of Appeals for the Federal Circuit (as noted by citations to "Fed. Cir. ") and the Court of Appeals for Veterans Claims (as noted by citations to "Vet. App.").

The Board is bound by statute to set forth specifically the issue under appellate consideration and its decision must also include separately stated findings of fact and conclusions of law on all material issues of fact and law presented on the record, and the reasons or bases for those findings and conclusions. See 38 U.S.C.A. § 7104(d); see also 38 C.F.R. § 19.7 (implementing the cited statute); see also Vargas-Gonzalez v. West, 12 Vet. App. 321, 328 (1999); Gilbert v. Derwinski, 1 Vet. App. 49, 56-57 (1990) (The Board's statement of reasons and bases for its findings and conclusions on all material facts and law presented on the record must be sufficient to enable the claimant to understand the precise basis for the Board's decision, as well as to facilitate review of the decision by courts of competent appellate jurisdiction. The Board must also consider and discuss all applicable statutory and regulatory law, as well as the controlling decisions of the appellate courts).

Duties to Notify and Assist

The Veterans Claims Assistance Act of 2000 (VCAA), Pub. L. No. 106-475, 114 Stat. 2096 (2000) provides that VA has a duty to notify the Veteran of any information and evidence needed to substantiate and complete a claim and to assist the Veteran in obtaining evidence necessary to substantiate the claim. 38 U.S.C.A. §§ 5102, 5103, 5103A (West 2002); 38 C.F.R. §§ 3.159(b), (c) (2010).

Proper notice from VA must inform the claimant of any information and evidence not of record (1) that is necessary to substantiate the claim; (2) that VA will seek to provide; and (3) that the claimant is expected to provide. This notice must be provided prior to an initial unfavorable decision on a claim by the agency of original jurisdiction (AOJ). Mayfield v. Nicholson, 444 F.3d 1328 (Fed. Cir. 2006); Pelegrini v. Principi, 18 Vet. App. 112 (2004).

In Dingess v. Nicholson, 19 Vet. App. 473, 486 (2006), the U.S. Court of Appeals for Veterans Claims held that, upon receipt of an application for a service-connection claim, 38 U.S.C. § 5103(a) and 38 C.F.R. § 3.159(b) require VA to review the information and the evidence presented with the claim and to provide the claimant with notice of what information and evidence not previously provided, if any, will assist in substantiating, or is necessary to substantiate, each of the five elements of the claim, including notice of what is required to establish service connection and that a disability rating and an effective date for the award of benefits will be assigned if service connection is awarded. VA has complied with its duty to notify the Veteran through notice letters sent in February 2004, September 2004, February 2006, and May 2006 which informed the Veteran of all required elements for service connection. 

The Veteran was afforded a VA PTSD examination in March 2010 and he failed to report for his March 2010 VA neurology examination. Pursuant to 38 C.F.R. § 3.655, when entitlement to a benefit cannot be established without a current VA examination, and a claimant, without good cause, fails to report for such examination, scheduled in conjunction with an original compensation claim, the claim shall be rated based on the evidence of record. 38 C.F.R. § 3.655(b) (2010). Again, the Court has held, "The duty to assist is not always a one-way street. If a veteran wishes help, he cannot passively wait for it in those circumstances where he may or should have information that is essential in obtaining the putative evidence." See Wood, 1 Vet. App. at 193. 


The Merits of the Claims

Service Connection - In General

Service connection will be granted if the evidence demonstrates that a current disability resulted from an injury or disease incurred in or aggravated by active military service. 38 U.S.C.A. §§ 1110, 1131; 38 C.F.R. § 3.303(a).

Establishing service connection generally requires (1) medical evidence of a current disability; (2) medical or, in certain circumstances, lay evidence of in-service incurrence or aggravation of a disease or injury; and (3) medical evidence of a nexus between the claimed in-service disease or injury and the present disability. Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004); see Caluza v. Brown, 7 Vet. App. 498, 506 (1995), aff'd per curiam, 78 F.3d 604 (Fed.Cir.1996) (table). 

Under 38 C.F.R. § 3.303(b), an alternative method of establishing the second and third Shedden/Caluza element is through a demonstration of continuity of symptomatology. Barr v. Nicholson, 21 Vet. App. 303 (2007); see Savage 10 Vet. App. 488, 495-97 (1997); see also Clyburn v. West, 12 Vet. App. 296, 302 (1999). Continuity of symptomatology may be established if a claimant can demonstrate (1) that a condition was "noted" during service; (2) evidence of post- service continuity of the same symptomatology; and (3) medical or, in certain circumstances, lay evidence of a nexus between the present disability and the post-service symptomatology. Savage, 10 Vet. App. at 495-96; see Hickson, 12 Vet. App. at 253 (lay evidence of in-service incurrence sufficient in some circumstances for purposes of establishing service connection); 38 C.F.R. § 3.303(b).

In the case of any veteran who has engaged in combat with the enemy in active service during a period of war, satisfactory law or other evidence that an injury or disease was incurred or aggravated in combat will be accepted as sufficient proof of service connection if the evidence is consistent with the circumstances, condition, or hardships of such service, even though there is no official record of such incurrence or aggravation. Every reasonable doubt shall be resolved in favor of the veteran. 38 U.S.C.A. § 1154(b); 38 C.F.R. § 3.304(d) (2010).

However, 38 U.S.C.A. § 1154(b) can be used only to provide a factual basis upon which a determination could be made that a particular disease or injury was incurred or aggravated in service, not to link the claimed disorder etiologically to the current disorder. See Libertine v. Brown, 9 Vet. App. 521, 522-23 (1996). Section 1154(b) does not establish service connection for a combat veteran; it aids him by relaxing the adjudicative evidentiary requirements for determining what happened in service. A veteran must still generally establish his claim by competent medical evidence tending to show a current disability and a nexus between that disability and those service events. See Gregory v. Brown, 8 Vet. App. 563, 567 (1996).

There must be objective indications of chronic disability, and this includes "signs" in the medical sense of objective evidence perceptible to an examining physician and other, non-medical indicators that are capable of independent verification. 38 C.F.R. § 3.317(a)(3). A disability is considered chronic if it has existed for six months or more, even if exhibiting intermittent episodes of improvement and worsening throughout that six-month period. 38 C.F.R. § 3.317(a)(4).

Service connection may be granted for any disease diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disease was incurred in service. Presumptive periods are not intended to limit service connection to diseases so diagnosed when the evidence warrants direct service connection. The presumptive provisions of the statute and VA regulations implementing them are intended as liberalizations applicable when the evidence would not warrant service connection without their aid. 38 C.F.R. § 3.303(d).

If psychosis becomes manifest to a degree of 10 percent within one year of separation from active service, then it is presumed to have been incurred during active service, even though there is no evidence of psychosis during service. This presumption is rebuttable by affirmative evidence to the contrary. 38 U.S.C.A. §§ 1101, 1112, 1113; 38 C.F.R. §§ 3.307, 3.309.

A veteran who, during active military, naval, or air service, served in the Republic of Vietnam during the Vietnam era (beginning in January 1962 and ending in May 1975) shall be presumed to have been exposed during such service to herbicide agents, including an herbicide commonly referred to as Agent Orange. 38 U.S.C.A. § 1116(a)(3) (West 2002); 38 C.F.R. §§ 3.307, 3.309. However, a veteran must actually set foot within the land borders of Vietnam, to include the contiguous waterways, in order to be entitled to the statutory presumptions for disabilities claimed as a result of exposure to herbicides. See Haas v. Peake, 525 F.3d 1168 (Fed. Cir. 2008); see also VAOPGCPREC 27-97.

Whenever VA's Secretary determines, on the basis of sound medical and scientific evidence, that a positive association exists between the exposure of humans to an herbicide agent and the occurrence of a disease in humans, the Secretary shall prescribe regulations providing that a presumption of service connection is warranted for that disease. 38 U.S.C.A. § 1116(b)(1) (West 2002).

If a veteran was exposed to an herbicide agent during active military service, the following diseases are presumed to have been incurred in service if manifest to a compensable degree within specified periods, even if there is no record of such disease during service: AL amyloidosis, chloracne or other acneform disease consistent with chloracne, Type 2 diabetes (also known as Type II diabetes mellitus or adult-onset diabetes), Hodgkin's disease, ischemic heart disease (including, but not limited to, acute, subacute, and old myocardial infarction; artherosclerotic cardiovascular disease including coronary artery disease (including coronary spasm) and coronary bypass surgery; and stable, unstable and Prinzmetal's angina), all chronic B-cell leukemias (including, but not limited to, hairy-cell leukemia and chronic lymphocytic leukemia), multiple myeloma, non-Hodgkin's lymphoma, Parkinson's disease, acute and subacute peripheral neuropathy, porphyria cutanea tarda, prostate cancer, respiratory cancers (cancer of the lung, bronchus, larynx, or trachea), and soft-tissue sarcoma (other than osteosarcoma, chondrosarcoma, Kaposi's sarcoma, or mesothelioma). 38 U.S.C.A. § 1116(a)(2) (West 2002); 38 C.F.R. §§ 3.307(a)(6), 3.309(e) (2010).

VA's Secretary has determined that a presumption of service connection based on exposure to herbicides to include Agent Orange used in the Republic of Vietnam during the Vietnam era is not warranted for any condition for which the Secretary has not specifically determined a presumption of service connection is warranted. See Notice, 72 Fed. Reg. 32,395 (2007).

Notwithstanding the provisions relating to presumptive service connection, which arose out of the Veteran's Dioxin and Radiation Exposure Compensation Standards Act, Pub. L. No. 98-542, § 5, 98 Stat. 2,725, 2,727-29 (1984), and the Agent Orange Act of 1991, Pub. L. No. 102-4, § 2, 105 Stat. 11 (1991), the Federal Circuit has determined that a claimant is not precluded from establishing service connection with proof of direct causation. See Combee v. Brown, 34 F.3d 1039, 1042 (Fed. Cir. 1994); 38 C.F.R. § 3.303(d) (2010).

Service Connection for an Acquired Psychiatric Disorder, to include PTSD

The Veteran has alleged numerous occurrences during his military service led to his psychiatric disorder. Among these assertions are his May 1992 report that he was repeatedly assaulted by his drill instructors and other superiors during basic training and during regular service; that he was twice pushed from a helicopter from a height of about 15 feet (in other reports, the Veteran has alleged that he was twice pushed from a height of 20-25 feet). Also in May 1992, the Veteran alleged that he was taken "secretly" back to Vietnam after the conclusion of the documented tour of duty. In July 1992, the Veteran apparently related in a VA examination that in addition to having served in Vietnam, he also may have served in Laos. He also alleged that he was involved in combat and wounded - he later alleged that he has numerous shrapnel wounds as noted below. In November 1996, he alleged that he was "sprayed" with herbicides four times while in Vietnam (once intentionally by unknown parties) and after one such occasion he was vomiting blood for a week. 

In a January 2004 statement, the Veteran alleged that the day he arrived in Vietnam, his unit received hostile gun fire and 10 people died. During the gun fire, he reported he was pushed down a gang plank to the ground and that he received shrapnel wounds to his hands, legs, and head. He also alleged that in addition to superiors beating him, members of his basic training unit were instructed to beat him. He also alleged that he was purposefully burned with hot water and cut with meat knives; that drill instructors purposefully placed his fingers in the ejection port of his rifle; that he had leeches placed on him and was doused with bleach; that he was hit with night sticks and rifle butts; that he was forced to kill women and children and that he was pushed overboard from a transport ship enroute from Vietnam to Japan. 

In a statement dated October 2007, the Veteran reported he saw seven of his best friends killed in Vietnam and "held their guts" in his hands. He indicated that he watched Republic of South Korea Marines cut a child's throat, sodomize and kill another child, kill babies, and execute Vietcong prisoners. He stated, "I guarantee you that there are no records of this... [I]f I had said anything about this[,] I would have been killed." 

However, the Veteran's service medical treatment and personnel records indicate a very different military history. First, a July 1969 pre-enlistment physical examination indicates no relevant abnormalities.

In October 1971, the Veteran was noted to have reported vomiting three times after receiving a flu shot. In an April 1972 hospitalization record pertaining to treatment for infectious hepatitis, it was noted that the Veteran had psychiatric care at age 17 for a brief history of juvenile crimes. In another hospitalization report pertaining to back pain, it was noted that service department psychiatric screening noted the Veteran had "obsessional thoughts and guilt and was schizoid." 

In a January 1973 clinical record titled "Psychiatry Report," it was noted that the Veteran had been seen in April 1972 as reported:

"because of disturbing nightmares, as well as daydreaming and distractability while on guard duty. At that time he also described his poor tolerance for the people he encountered while on sentry duty at the gate. He returned to [the neuropsychiatric clinic] on this date, displaying more overt anger, describing his declining performance of sentry duty, his more frequent conflicts with superiors, and his fear of loss of control of aggressive impulses.

[The Veteran] is a loner, simplistic, distrustful of others, quiet, with few friends. He is an inhibitor of angry feelings, but carries grudges and has strong internalized aggression. He is sensitive and easily disturbed by small things. He is not neurotic or psychotic but quite anxious. He demonstrates a schizoid personality disorder. He is becoming less and less tolerant of the interpersonal hassles one encounters at the gate, especially the frequent challenges of his authority." 

The military medical examiner recommended that the Veteran be removed from guard duty "because of his marked sensitivity to interpersonal conflicts and his explosiveness." 

The Veteran's military record of service ((Navy-Marine Corps Form 118(3)) indicates that his primary duty training was as a wireman. On June 28, 1970, he arrived in Vietnam and was assigned in his specialty until his departure from Vietnam on August 18, 1970.

An April 1973 discharge examination report included in the Veteran's original and official U.S. Government records was obtained from the Veteran's service department in or around May 1973. Significantly in light of the Veteran's late assertions, the report noted there was no change from the enlistment physical examination in July 1969. There was one abnormal clinical evaluation for identifying body marks, scars, and tattoos. In the notes section, the examiner noted mild viral hepatitis in March 1972 and possible malaria, not confirmed, in June 1970. The summary of defects and diagnoses section was left blank. The examination report was signed by R. S. Bennett, a Lieutenant in the Medical Corps, as well as the Veteran.

However, in a discharge examination report submitted by the Veteran in or around January 2004, indications of normal clinical evaluation for the ears and upper extremities were crossed out and marked as abnormal. The following notations were included in the notes section: "Both ears constantly Ring (sic) damaged hearing due to explosions while in Viet Mam (sic) during combat mission," and "(L) shoulder Injured (sic) Da Nang, South Viet Mam (sic) during combat mission." Additionally, in the summary of defects and diagnoses section, there were notations indicating damaged hearing and a left shoulder injury due to explosions during a mission in Southeast Asia. The examination report was signed by R. B. Annis of the Dental Corps. As opposed to the document as found in the Veteran's service records, the document proffered by the Veteran also inexplicably indicates the examiner's conclusion that the Veteran is qualified to received an honorable discharge - a recommendation that is plainly not within the province of a military medical examiner. 

The Board finds the discharge examination report as submitted by the Veteran, as well as the Veteran's later accounts of his being the repeated target of assaults by his fellow maries, warrant no probative value. Given the Veteran's official military record, as well as his original service department medical records, the Veteran's proffered discharge examination report and his account are plainly fabrications.

 The discharge examination report, as well as the Veteran's original service treatment records, obtained from the service department are highly probative both as to the Veteran's subjective reports and their resulting objective findings. They were generated with a view towards ascertaining the Veteran's then-state of physical fitness and are akin to statements of diagnosis or treatment. Rucker v. Brown, 10 Vet. App. 67, 73 (1997) (Observing that although formal rules of evidence do not apply before the Board, recourse to the Federal Rules of Evidence may be appropriate if it assists in the articulation of the reasons for the Board's decision); see also LILLY'S: AN INTRODUCTION TO THE LAW OF EVIDENCE, 2nd Ed. (1987), pp. 245-46 (many state jurisdictions, including the federal judiciary and Federal Rule 803(4), expand the hearsay exception for physical conditions to include statements of past physical condition on the rational that statements made to physicians for purposes of diagnosis and treatment are exceptionally trustworthy since the declarant has a strong motive to tell the truth in order to receive proper care). In contrast to the examination report submitted by the Veteran, the records obtained from his service department reveal no evidence of tinnitus, hearing loss, a left shoulder injury, or any indications that the Veteran participated in combat missions.

The evidence of record otherwise contains a March 1988 chronological medical progress note, where the Veteran was noted to have been referred for counseling by his probation officer, after a long history of violent behavior. In September 1991 while incarcerated, the Veteran received counseling for violent behavior, and he reported that he "function[ed] still as a Marine." A provisional diagnosis of "R/O ["rule out"] PTSD was rendered by the counseling. He received consistent counseling for both violent behavior and suspected PTSD during this time period. During this period, a VA licensed social worker reported that the Veteran was a "combat Vietnam vet[eran]." 

In a February 1992 VA mental health note, the Veteran reported that he saw combat in the Marine Corps. The examiner observed "minor indications" that might have been PTSD-related. 

In a May 1992 stressor statement and during a July 1992 VA examination, the Veteran in part alleged that he was diagnosed with "delayed stress syndrome" while admitted to a hospital after falling down a flight of stairs in-service - an assertion that is directly belied by his service treatment records as noted above. 

Further, apart from his misrepresentation as to his in-service diagnosis during the July 1992 VA examination, the Veteran indicated that he served in Vietnam and possibly Laos. He reported he was involved in combat, he was wounded, and had friends who were wounded and killed. Although the examiner diagnosed PTSD, he did not provide a basis for the diagnosis apart from the Veteran's reported in-service diagnosis nor any supporting rationale.

In a June 1995 Orange County Corrections Facility (33rd Street Jail) treatment note, the diagnosis was PTSD by history. In a psychological evaluation report requested by the Veteran's attorney and subsequent to a court order to assess the Veteran's current level of psychological functioning, Michelle Muensenmeyer, M.S., and Deborah O. Day, Psy.D., stated they interviewed the Veteran in October and November 1995. 

During the evaluation, the Veteran reported he had two tours of duty in Vietnam as a sniper - assertion as to both alleged events which have no basis in the record and which indicate the Veteran was then misrepresenting his military history. It was noted that he had a history of criminal activity that dated back to the 1960s when he was a juvenile. He was diagnosed with a depressive disorder, not otherwise specified, with paranoid and anxious features, and a personality disorder.

In a transcript from the mitigation phase of an undated sentencing from court proceedings that presumably took place after the November 1995 psychological evaluation, the Veteran's attorney argued that the Veteran lived a fairly traumatic life. It started as a young man growing up in a fairly abusive household with a mother who was physically and emotionally abusive towards him. Later, he served "several tours" in the Vietnam War and was exposed to "a lot of terror and a lot of horror," including witnessing civilians being hurt and killed. Again, whatever source of information the Veteran's counsel may have had (likely the Veteran) the Veteran did not serve "several tours," in Vietnam, but instead approximately only 50 days as a wireman. 

In an April 1996 Florida Department of Corrections psychiatric evaluation, the Veteran reported a long history of parental conflicts since an early age and attendance at two Florida state reformatories. He joined the Marine Corps and served one tour in Vietnam. However, the Veteran again misrepresented his military record, and related that he was a sniper and described a series of killing combatants and civilians, including children and women. He stated he cut some ears and fingers off and wore them around his neck. The diagnoses were bipolar disorder and schizoid personality disorder.

During an August 1996 Apalachee Correctional Institution psychological evaluation, the Veteran reported he attended the Dozier School for Boys as an adolescent because of car thefts and break-ins. He was disciplined at home with a switch, which cut his skin. 

The Veteran then continued to misrepresent his military history. He indicated that he served in a "special unit" in Vietnam and he worked with explosives. He related a history of "very involved combat" involving brutal killings, and that he and his comrades made necklaces of the body parts of the Vietcong they killed. He said he was sent on "secret missions" in Vietnam to "search and destroy." The diagnoses were intermittent explosive disorder; bipolar disorder history; "? PTSD," and antisocial and schizoid personality disorder. 

However, even given the Veteran's patent misrepresentation as to his military service, the examining psychiatrist observed that "[o]stensibly he presents 'posttraumatic' picture, but his mental associations with this are not so much of the trauma as they are his frustrations over failed interpersonal relationships, which seems to be more in line with his schizoid personality background than an actual PTSD." 

In a November 1996 statement, the Veteran reported that his mental problems had "continually plagued" him since his service in Vietnam. He alleged that he was first diagnosed with PTSD in June 1970 in Da Nang. He reported he was next diagnosed with PTSD by a psychiatrist while he was at the Marine Barracks in New London. He indicated that his original DD-214 noted his reason for discharge was "behavioral problems related to PTSD." Throughout the record, the Veteran asserted that his original DD-214 was changed and the DD-214 within the claims file was an altered version of the original which omitted the reason for discharge. 

As noted, the Veteran's account of in-service diagnosis of PTSD and his asserted reason for discharge from active duty are not credible and are indeed directly belied by the record. There is also no evidence to suggest that the records presently cited by the Board are inaccurate or that the DD-214 of record is inaccurate or altered. 

He asserted he was also diagnosed with PTSD by an examiner at the VA Medical Center in Orlando, a physician at the 33rd Street Jail in Orlando, and a nurse at the Orlando Reception Center Prison. He stated that since 1977, he had two court-ordered evaluations which revealed he had PTSD and severe mental problems, which he attributed to exposure to Agent Orange.

The Veteran's assertion as to such diagnoses is also not credible. In a January 1997 Florida Department of Corrections psychological evaluation, the Veteran was diagnosed with intermittent explosive disorder and antisocial personality disorder. The psychiatric consult stated, "Diagnostically[,] I think he has schizoid and paranoid personality structure and may be somewhat prone to lapse into paranoid psychosis when under alot (sic) of stress. I don't find a major Axis I diagnosis operative at this time."

In a January 2004 statement submitted by the Veteran, he alleged that he was beaten by his military service recruiters and the scores on his Armed Services Vocational Aptitude Battery (ASVAB) test and his psychological profile were altered to make him suitable for service. He asserted that prior to boot camp, one Navy nurse, who was familiar with his entire record, told him that he would be "better cared for in a mental institution" because it was where he really belonged. In another statement submitted in January 2004, the Veteran alleged that during service, he was "hit, beat, slapped, punished, tortured, and made mentally ill and disabled" to the point that he would never be able to work again.

Critically as it bears upon the basis of knowledge by the March 2010 VA examiner, in another January 2004 statement, the Veteran related that at the age of seven, he was in "serious trouble" and was put in the San Diego Juvenile Detention Center. He reported a history of childhood abuse and a school psychologist told his parents that he had a severe learning disability and that he was mentally incompetent. He was expelled from school for fighting, property damage, arson, and using firecracker M-80's. He described incidents in childhood including returning home from school one day, finding some gas, and burning down three houses; beating five kids with a large stick which put them all in the hospital and disabled them; breaking and entering into buildings; and swinging sticks at peoples' heads until there was "blood all over the place." After the Veteran was allegedly court-ordered to join the Job Corps, he reported that around 1968, a doctor told him that he was mentally ill and incompetent, that he should be put in a mental institution, and that he was autistic with a severe learning disability.

As to his military service, the Veteran continued to misrepresent his record. He alleged that while in boot camp, he claimed that he was hit with belts and switches, his head was repeatedly slammed into the wall, he was not allowed to eat for one or two days at a time, he was burned with hot water from the kitchen, he was cut with knives, he was beat bloody with martial arts weapons, the drill instructor slammed his fingers in the M-14 rifle breach, he was hit with rifle butts and night sticks, and he was forced to walk guard duty while he was sick with strep throat. While he was stationed at Camp Lejeune, he alleged that he was pushed down stairs, hit with rifle butts, and other Marines would throw bars of soap at him. He also asserted the litany of abuse during active service as is reported above as well as being knocked unconscious, and choked out to unconsciousness on several occasions including while enroute to Japan, the redeployment movement where he also alleged that he was pushed overboard the vessel. When he returned to the states and was sent to the Marine Barracks in New London, the Veteran claimed he was verbally abused, hit with night sticks almost every day, and was forced to stand guard duty at a remote gate in isolation. He also reported other Marines pointed 45-caliber weapons at him and pulled the trigger, and he was forced to get a flu shot when he told the medical personnel he was allergic to them. 

In an October 2007 statement, the Veteran again claimed that the first time he was told he had some psychiatric disorders was before he left Da Nang. He asserted that before he entered service he was a "normal kid." He argued he had PTSD which began after abuse suffered during boot camp and was aggravated when he witnessed death every day while serving in Vietnam. Specifically, he reported he saw seven of his best friends killed and "held their guts" in his hands; he watched Republic of South Korea Marines cut a civilian girl's throat; witnessed a Vietcong guerilla sodomize and kill another civilian girl with a flare; he saw babies being killed; and watched as VietCong prisoners were executed. He related that there were no records of the incidents and if he had said anything about them, he would have been killed.

During a March 2010 VA PTSD examination, the Veteran reported that prior to service, he did not get along with others and he was told that he had a learning disability. He had no friends and did not attend high school. He had a history of juvenile charges for car theft, fighting in school, and theft, and he was put on probation and jailed. He was in the Job Corps, and then joined the Marine Corps. 

Paradoxically, the Veteran reported that after he enlisted, he adjusted to military life and, although his basic treatment was harsh, he enjoyed it. He reported combat experience in Da Nang, Vietnam, but no combat wounds were sustained, and no combat duties or awards are noted in his service personnel records.

The diagnoses were anxiety disorder and personality disorder. The examining psychologist determined the Veteran did not meet the diagnostic criteria for PTSD. He noted the Veteran was evaluated in 1973 and 1995, and he was diagnosed with underlying personality disorder traits, including schizoid and schizotypal traits, coupled with difficulty coping with symptoms of anxiety or depression which contributed to his poor functioning. Further, the psychologist opined that the Veteran did not have PTSD related to his military service because he had a lifelong pattern of difficulty related to personality factors. 

After a thorough review of all of the evidence of record, the Board will deny the claim of service connection for an acquired psychiatric disorder. 

As an initial matter, it must be shown that the Veteran has a current psychiatric disability made in accordance with DSM-IV because service connection cannot be established without a current disability. See Brammer v. Derwinski, 3 Vet. App. 223, 225 (1992); see also Gilpin v. West, 155 F.3d 1353 (Fed. Cir. 1998). 

There is no question that the Veteran has been treated for various symptoms attributable to various diagnosis (including schizoid personality disorder, depressive disorder, personality disorder, bipolar disorder, intermittent explosive disorder, antisocial personality disorder, and an anxiety disorder). However, it is significant that the March 2010 VA examiner conducted the only medical inquiry that was specifically focused upon the question of whether the Veteran had a mental disorder related to military service. That examination, as discussed below, ruled out such a connection. 

An August 1996 correctional institute psychiatrist specifically stated the Veteran "presents 'posttraumatic' picture, but his mental associations with this are not so much of the trauma as they are his frustrations over failed interpersonal relationships, which seems to be more in line with his schizoid personality background than an actual PTSD." Similarly, a January 1997 corrections facility psychiatrist stated, "Diagnostically[,] I think he has schizoid and paranoid personality structure and may be somewhat prone to lapse into paranoid psychosis when under alot (sic) of stress. I don't find a major Axis I diagnosis operative at this time." 

During the March 2010 VA PTSD examination report, the examiner evaluated the Veteran for PTSD, and specifically ruled out such a diagnosis because the Veteran did not meet the diagnostic criteria for PTSD. After providing a thorough background of the Veteran's mental and medical history, the examiner reasoned that the Veteran had a lifelong pattern of difficulty related to personality factors. Moreover, the examiner diagnosed the Veteran with an anxiety disorder and personality disorder. 

In adjudicating a claim, the Board must assess the competence and credibility of the Veteran. See Buchanan, 451 F.3d at 1331; Washington v. Nicholson, 19 Vet. App. 362, 368-69 (2005). The Board also has a duty to assess the credibility and weight given to evidence. Madden v. Gober, 125 F.3d 1477, 1481 (Fed. Cir. 1997); Wensch v. Principi, 15 Vet. App. 362, 367 (2001). 

Moreover, to the extent that mental health care providers have noted the Veteran's military service in their reports, it cannot be doubted that such observations were plainly undermined by the Veteran's patently incredible accounts of his military service. As noted above, the Veteran's service treatment and personnel records indicate that he served approximately 53 days, and not two tours in Vietnam; that he served as a "wireman," and not a "sniper;" that he was not diagnosed with PTSD in Vietnam or stateside posting or subsequently by any competent medical examiner with a comprehensive review of all of the facts of record; that he has no shrapnel or other wounds resultant of combat from official governmental sources; and that he was discharged from service after military service after three years and seven months. 

While the Veteran is competent to provide testimony or statements relating to symptoms or facts of events that he has observed and is within the realm of his personal knowledge, he is not competent to establish that which would require specialized knowledge or training, such as medical expertise. Layno v. Brown, 6 Vet. App. 465, 469-70 (1994). The record does not show, nor does the Veteran contend, that he has specialized education, training, or experience that would qualify him to provide an opinion on this matter. The Veteran, is not competent to opine on medical matters such as diagnoses or etiology of medical disorders, and his opinion as to his claimed psychiatric disorders and their relationship to his service is therefore entitled to no weight of probative value. See Cromley v. Brown, 7 Vet. App. 376, 379 (1995); Espiritu v. Derwinski, 2 Vet. App. 492, 494-95 (1992).

Under Jandreau v. Nicholson, 492 F.3d 1372 (Fed. Cir. 2007), lay evidence can be competent and sufficient to establish a diagnosis of a condition when (1) a layperson is competent to identify the medical condition, (2) the layperson is reporting a contemporaneous medical diagnosis, or (3) lay testimony describing symptoms at the time supports a later diagnosis by a medical profession. See also Buchanan v. Nicholson, 451 F.3d 1331 (Fed. Cir. 2006) (holding that VA cannot determine that lay evidence lacks credibility merely because it is unaccompanied by contemporaneous medical evidence).

The Veteran's statements do not fall within prongs (1) or (2) of the Jandreau criteria. To the extent that the lay statements are applicable to prong (3), they have been investigated by a competent medical professional who has found that the Veteran does not have PTSD; rather, he diagnosed a personality disorder. 


Additionally, the Board notes the in-service diagnoses of a personality disorder in May 1972, August 1972, and January 1973; post-service diagnoses of a personality disorder in March 1988, November 1995, April 1996, and January 1997; and the current personality disorder diagnosis in March 2010. However, under 38 C.F.R. § 4.127, personality disorders are not diseases or injuries for compensation purposes, and disability resulting from them may not be service-connected. Thus, there is insufficient evidence to grant service connection for an acquired psychiatric disorder. 38 C.F.R. § 3.303, 3.304(f), 4.125(a), Clemons, supra.

Finally, the Board notes the Veteran's contention that his claimed severe mental problems were caused by exposure to Agent Orange does not warrant an award of service connection on a presumptive basis. As discussed above, VA's Secretary has determined that a presumption of service connection based on exposure to herbicides to include Agent Orange used in the Republic of Vietnam during the Vietnam era is not warranted for any condition for which the Secretary has not specifically determined a presumption of service connection is warranted. See Notice, 72 Fed. Reg. 32,395 (2007). Mental conditions are not among the listed conditions, therefore no presumption applies.

Consequently, the preponderance of the evidence is against the claim, and the claim for service connection for an acquired psychiatric disorder is denied.

In reaching this decision, the Board has considered the doctrine of reasonable doubt; however, as the preponderance of the evidence is against the Veteran's claim for service connection for an acquired psychiatric disorder, the doctrine of reasonable doubt is not for application. See 38 U.S.C.A. § 5107(b); Gilbert v. Derwinski, 1 Vet. App. 49, 55-57 (1990).

Service Connection for a Right Shoulder Disorder

A May 1972 service treatment note from the Naval Submarine Medical Center in Groton, Connecticut, documented the Veteran's complaints of low back pain after he fell down a flight of stairs in the barracks of the Naval Submarine Base in New London. No complaints of right shoulder pain were noted in the report.

In an August 1996 Florida Department of Corrections treatment note, the Veteran complained of shoulder pain, but the examiner did not indicate which shoulder caused the Veteran pain.

In a February 1997 statement, the Veteran claimed that his right shoulder was damaged and the joint clicked and grinded. He indicated that his right shoulder did not bother him until 1993.

In an April 2004 statement, the Veteran reported his right arm clicked all the time and hurt.

In an April 2004 Form 21-4142, the Veteran alleged that he injured his right arm when he fell down the stairs at the Marine Barracks in New London. 

In a March 2006 statement, the Veteran asserted that his right shoulder was injured in Vietnam.

During a September 2006 VA brain examination, the Veteran demonstrated decreased strength in his right arm due to shoulder pain.

In a May 2010 statement, the Veteran alleged that he sustained a shoulder injury after he rolled down a mountain during infantry training after boot camp.

Based upon the evidence of record, the Board finds that the Veteran's claimed right shoulder disability is not shown to have developed as a result of an established event, injury, or disease during active service. 

Where a determinative issue involves medical causation or a medical diagnosis, competent medical evidence is required. Grottveit v. Brown, 5 Vet. App. 91, 93 (1993). Although the Veteran is competent to provide evidence of visible symptoms, he is not competent to provide evidence that requires medical knowledge. Espiritu v. Derwinski, 2 Vet. App. 492 (1992). To the extent that the Veteran claims that his right shoulder pain began in service; the Board finds that the medical evidence of record outweighs the Veteran's assertion. 

Service treatment records were silent for complaints in service for any complaints regarding his right shoulder. Despite a finding of decreased right arm strength due to shoulder pain in the neurological component of the March 2010 VA brain examination, there is no current diagnosis, and there are no medical statements or opinions of record that relate the Veteran's right shoulder pain to service or to any incident of service. There are only the Veteran's statements that allege he was injured when he fell down the stairs at the Marine Barracks in New London (see April 2004 Form 21-4142), he injured his right shoulder in Vietnam (see March 2006 statement), and that he injured his right shoulder when he rolled down a mountain during infantry training (see May 2010 statement). These unsubstantiated assertions amount to opinions about a matter of medical causation, and the Veteran is not competent to provide these opinions. See Jandreau, 492 F.3d at 1372.

However, the Veteran also reported his right shoulder did not bother him until 1993, many years after his separation from service (see February 1997 statement). Evidence of a prolonged period without medical complaint after service can be considered along with other factors. See Maxson v. Gober, 230 F.3d 1330 (Fed. Cir. 2000).

For the foregoing reasons, the claim for service connection for a right shoulder disability must be denied. In arriving at the decision to deny the claim, the Board has considered the applicability of the benefit-of-the-doubt doctrine. However, in the absence of competent and persuasive evidence to support the claim, that doctrine is not applicable. See 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102; Gilbert v. Derwinski, 1 Vet. App. 49, 53-56 (1990).

Service Connection for a Right Foot Disorder

In a January 2004 statement, the Veteran claimed that he was given Flurinol at Marine Barracks. It made him pass out and he was thrown on a table and stabbed in the right foot.

In April 2004 and September 2004 statements, the Veteran asserted that a corpsman stuck a needle in his right foot when he was given Flurinol and passed out at the sub base in New London. He said it was not recorded. He reported he had a knot on the bottom of his right foot and it hurt when he worked a lot.

In a March 2006 statement, the Veteran alleged that his right foot was injured in Vietnam. 

The Board finds that the Veteran's claimed right foot disability is not shown to have developed as a result of an established event, injury, or disease during active service. 

Service treatment records were silent for any complaints concerning the Veteran's right foot. There are no medical statements or opinions of record that relate the Veteran's current right foot pain to service or to any incident of service. There are only the Veteran's contentions that his right foot was injured in service, either by a Navy corpsman or in Vietnam. These unsubstantiated assertions amount to an opinion about a matter of medical causation. 

Even assuming that the Veteran is credible in his account of being stabbed in the foot, (which he is plainly not), while he is competent to report right foot pain, a determination of the etiology of the disability requires medical knowledge that the Veteran is not shown to have; thus he is not competent (i.e., professionally qualified) to offer an opinion as to whether claimed his right foot disability had its onset in service or is causally related to any incident of service. See Jandreau, 492 F.3d at 1372.

The claim for service connection for a right foot disability must be denied. In arriving at the decision to deny the claim, the Board has considered the applicability of the benefit-of-the-doubt doctrine. However, in the absence of competent and persuasive evidence to support the claim, that doctrine is not applicable. See 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102; Gilbert v. Derwinski, 1 Vet. App. 49, 53-56 (1990).

Service Connection for Numbness in the Hands

In a January 1997 statement, the Veteran alleged that numbness in his arms began after he was exposed to Agent Orange while serving in Vietnam in June, July, and August 1970. He reported he was sprayed a total of six times, and one time he was sprayed intentionally. He stated that his left hand had been numb since he left Vietnam. In a November 2005 statement, the Veteran reported his hands went numb. During a September 2006 VA brain and spinal cord examination, the Veteran denied numbness. In a statement received in November 2006, the Veteran alleged that his arms went numb as a result of abusive treatment, being thrown from a helicopter, and being thrown down three flights of stairs at the Marine Barracks.

In a May 2010 statement, the Veteran claimed that he had nerve damage after he was thrown from a helicopter gun ship and hit the ground from 20 feet in the air. He said a Navy medic that he called TJ told him he had nerve damage and that it would "mess with" him as he got older.

Based upon the evidence of record, the Board finds that the Veteran's claimed disability manifested by numbness in the hands is not shown to have developed as a result of an established event, injury, or disease during active service. 

Service treatment records were silent for complaints in service for any numbness in his hands. There is no current diagnosis of any disability manifested by numbness in the hands. Further hurting his claim, the Veteran denied any numbness during a September 2006 VA brain and spinal cord examination.

Additionally, there are no medical statements or opinions of record that relate the Veteran's claimed disability to service or to any incident of service. There were only the Veteran's contentions that he was exposed to Agent Orange, he was abused, thrown from a helicopter, and thrown down three flights of stairs in service; and these events caused current nerve damage that manifested in numbness in his hands. These unsubstantiated assertion amounts to opinions about a matter of medical causation, which the Veteran is not competent to provide. See Jandreau, 492 F.3d at 1372.

For the foregoing reasons, the claim for service connection for a disability manifested by numbness in the hands must be denied. In arriving at the decision to deny the claim, the Board has considered the applicability of the benefit-of-the-doubt doctrine. However, in the absence of competent and persuasive evidence to support the claim, that doctrine is not applicable. See 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102; Gilbert v. Derwinski, 1 Vet. App. 49, 53-56 (1990).

Service Connection for the Residuals of a Concussion including Headaches

In August 1972, the Veteran complained of trauma to the head and chest. Clinical examiners noted that he was "stuporous but rousable." Neurological examination and skull radiographic examination was normal. On two subsequent entries, it was noted that physical examination remained unchanged but the Veteran continued to complain of headaches and dizziness. In late August 1972, the Veteran complained of headaches and a "feeling of pressure" in his head. 

An August 28, 1972 neurology report indicated that the Veteran was initially admitted to the hospital after "allegedly" being hit by a slowly moving car. Clinical examination then found "no signs of skull trauma, or tenderness" or other relevant abnormalities. Although a diagnostic impression of "post-concussive headaches" was noted, examiners also recorded that there were "no abnormal neurological signs," and the Veteran had a personality disorder of unclear type. In another service treatment note dated August 1972, the nurse reported that a neurologist confirmed an impression of post-concussive headaches, but examination revealed normal extra ocular movement and normal convergence.

In a June 1996 Florida Department of Corrections treatment note, the Veteran complained of intermittent headaches for the past month or month and a half. 

In a June 2004 statement, the Veteran related that he was hit several times in the head with a broom handle and his skull was broken to the point where his brain tissue showed. He reportedly had an X-ray at the Naval Hospital and the doctor gave him "a shot in the brain". 

He also reported he was hit in the side of the head with a piece of shrapnel from a grenade throwing exercise in Puerto Rico. 

In a November 2005 statement, the Veteran claimed that when he was pushed down the stairs at the New London submarine base, he sustained a head injury and nerve damage. 

In March 2006, the Veteran submitted a newspaper clipping about TBI and various photographs that he made notations on. He claimed that while in Vietnam, he was in a helicopter hit by machine gun fire and he sustained head injuries which resulted in TBI.

During a September 2006 VA brain examination, the Veteran complained of post-concussive headaches that began in 1972 following a car accident which resulted in a head injury. He reported stress headaches since the accident, but he could not relate his head injury to his current headaches. He claimed that anxiety caused his current headaches. He also mentioned that he sustained a head injury after he fell down the stairs in Connecticut in 1972. The diagnosis was post-concussive headaches. The examiner opined it was less likely as not (less than 50/50 probability) that the Veteran's current headaches were a result of his history of post-concussive heachaches secondary to head trauma in 1972. The Veteran was unclear as to whether his current headaches were related to his headaches after his accident in 1972, and he claimed that his most recent headaches had gotten worse over the last four years and were usually secondary to anxiety. He also had elevated blood pressure which may have resulted in headaches.

In a December 2006 Form 9, Appeal to the Board, the Veteran alleged that his first head injury was sustained in Vietnam, and he subsequently sustained two more head injuries while he was stationed at the Marine Barracks on the submarine base in New London. He also reported that he hit his head a number of times since boot camp.

In a May 2010 statement, the Veteran alleged that he sustained a head injury after he rolled down a mountain during infantry training after boot camp.

Based upon the evidence of record, the Board finds that the Veteran's claimed post-concussive headaches are not shown to have developed as a result of an established event, injury, or disease during active service. 

Firstly and as detailed at length above, the Veteran's assertions as to occurrences during military service are not credible. Service treatment notes documented a 1972 car accident in which the Veteran sustained a head injury and a probable concussion. He was evaluated for post-concussive headaches throughout August 1972 and examinations revealed normal extra ocular movement and no neurological abnormalities.

Following service, there were no further complaints concerning headaches until a June 1996 Florida Department of Corrections treatment note, where the Veteran complained of intermittent headaches for the past month or month and a-half. The Court has held that evidence of a prolonged period without medical complaint after service can be considered along with other factors. See Maxson, 230 F.3d at 1330.

The September 2006 VA brain examination report is probative medical evidence regarding the claim. The VA examiner opined that it was less likely as not (less than 50/50 probability) that the Veteran's current headaches were a result of a history of post-concussive headaches secondary to head trauma in 1972. He noted that even the Veteran was unclear as to whether his current headaches were related to his headaches following the 1972 accident, and claimed that his headaches had worsened over the past four years and were secondary to anxiety. The examiner also noted that the Veteran's elevated blood pressure may have caused the current headaches. 

A lay person, such as the Veteran, is not competent to opine on matters beyond the scope of his competence, such as medical knowledge pertaining to the diagnosis or cause of a disease, and his opinion that his headaches are related to service is therefore entitled to no weight of probative value. See Cromley v. Brown, 7 Vet. App. 376, 379 (1995); Espiritu v. Derwinski, 2 Vet. App. 492, 494-95 (1992); see also Jandreau v. Nicholson, 492 F.3d 1372, 1377 (Fed. Cir 2007) (holding that a layperson may provide competent evidence to establish a diagnosis where the lay person is "competent to identify the medical condition"). 

The Veteran is competent to report that he has headaches, but a determination of the etiology of the disability requires medical knowledge that the Veteran is not shown to have; thus he is not competent (i.e., professionally qualified) to offer an opinion as to whether his headaches began in service or are causally related to any incident of service.

The claim for service connection for post-concussive headaches must be denied. In arriving at the decision to deny the claim, the Board has considered the applicability of the benefit-of-the-doubt doctrine. However, in the absence of competent and persuasive evidence to support the claim, that doctrine is not applicable. See 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102; Gilbert v. Derwinski, 1 Vet. App. 49, 53-56 (1990).

Entitlement to TDIU

In order to establish service connection for a total rating based upon individual unemployability due to service-connected disability (TDIU), there must be an impairment so severe that it is impossible to follow a substantially gainful occupation. See 38 U.S.C.A. § 1155; 38 C.F.R. §§ 3.340, 3.341, 4.16. In reaching such a determination, the central inquiry is "whether the Veteran's service connected disabilities alone are of sufficient severity to produce unemployability." See Hatlestad v. Brown, 5 Vet. App. 524, 529 (1993). Neither non-service-connected disabilities nor advancing age may be considered in the determination. 38 C.F.R. §§ 3.341, 4.19; Van Hoose v. Brown, 4 Vet. App. 361, 363 (1993).

For VA purposes, the term "unemployability" is synonymous with an inability to secure and follow a substantially gainful occupation. VAOPGPREC 75-91; 57 Fed. Reg. 2317 (1992). Consideration may be given to the Veteran's level of education, special training, and previous work experience in arriving at a conclusion, but not to his age or to the impairment caused by non-service-connected disabilities. See 38 C.F.R. §§ 3.341, 4.16, 4.19.

VA regulations establish objective and subjective standards for an award of total rating based on unemployability. When the Veteran's schedular rating is less than total (for a single or combination of disabilities), a total rating may nonetheless be assigned provided that if there is only one service-connected disability, this disability shall be rated at 60 percent or more. When there are two or more disabilities, at least one disability must be ratable at 40 percent or more, and any additional disabilities must result in a combined rating of 70 percent or more, and the disabled person must be unable to secure or follow a substantially gainful occupation. See 38 C.F.R. § 4.16(a). A total disability rating may also be assigned on an extra- schedular basis, pursuant to the procedures set forth in 38 C.F.R. § 4.16(b), for veterans who are unemployable by reason of service-connected disabilities, but who fail to meet the percentage standards set forth in section 4.16(a).

The Veteran is currently service connected for chronic lumbosacral strained which is rated as 10 percent disabling. His combined disability rating is 10 percent. Thus, he does not meet the schedular criteria for consideration of unemployability under 38 C.F.R. § 4.16(a).

Pursuant to 38 C.F.R. § 4.16(b), all cases of veterans who are unemployable by reason of service-connected disabilities, but who fail to meet the percentage standards of 38 C.F.R. § 4.16(a), are to be referred to the Under Secretary for Benefits or the Director, Compensation and Pension Service for consideration of an extraschedular evaluation. As such, the Board must determine whether the Veteran is unemployable by reason of service-connected disabilities.

During a private psychological evaluation by the Psychological Affiliates, Incorporated, in October and November 1995, the Veteran reported he had over 350 jobs in his lifetime. Each employment averaged less than six months. 

In an August 1996 Florida Department of Corrections psychological evaluation, the Veteran reported he did a lot of service station work after he was discharged from the military. His longest job as a delivery driver for a print shop lasted 14 months and terminated due to incarceration.

In a January 2004 statement, the Veteran claimed he was 100 percent disabled and he could not hold a job or work. 

In another statement submitted in January 2004, the Veteran alleged that during service, he was "hit, beat, slapped, punished, tortured, and made mentally ill and disabled" to the point that he would never be able to work again.

In a March 2004 statement, the Veteran listed his occupations as a delivery driver position for a print shop and a service station mechanic from 1980 to 1985. He left the service station job because the owner accused him of stealing his gun and because the job was "a lot of yelling and contention." He reported that most of the other jobs he had were either temporary or gas station jobs and they "did not last long" because he was unable to keep a job. He stated that he knew he was unable to hold a job because of his service in Vietnam, and how he was treated and "made to be mentally ill" and injured in the Marine Corps. 

The Veteran underwent a VA medical examination in June 2005. The Veteran reported he had to take Tylenol on a daily basis for his back pain. He reported no ongoing treatment for his back and that his back would flare intermittently when he lifted heavy things or walked more than two miles. 

In an October 2009 "buddy" statement, A. F., a foreman on construction sites, wrote that the Veteran could not stand any kind of stress while on construction jobs. Mr. F. said he gave the Veteran the simplest things to do and watched the Veteran become enraged at a moment's notice over anything. He felt the Veteran was very dangerous and more than capable of great damage. 

During a March 2010 VA PTSD examination, the Veteran reported he was working installing insulation for the past three to four years. The examiner opined that there was not total occupational and social impairment due to PTSD signs and symptoms, but found there was reduced reliability and productivity due to PTSD signs and symptoms. He noted the Veteran's global anger, frustration, and impulsiveness had a negative and very dangerous impact on most social, vocational, and interpersonal functioning. 

As discussed above, the Veteran does not meet the criteria for application of schedular TDIU criteria. However, he is service- connected for a low back disability and has contended that he is entitled to TDIU. Although a veteran who does not meet the criteria for schedular TDIU may be referred to the Compensation and Pension Service for evaluation of entitlement to TDIU on an extraschedular basis if he is found to be unemployable due to service-connected disabilities, here, the preponderance of the evidence is against a finding that his service-connected disability, alone, precludes the Veteran from obtaining and maintaining all forms of substantially gainful employment.

The record reflects that the Veteran experiences multiple non-service-connected disabilities that affect his employability and that a non-service- connected psychiatric disorder is primarily responsible for his inability to work. 

The Board finds that the Veteran is not unemployable as a result of only his service-connected disability. In rendering this decision, the Board notes that consideration cannot be given to his age or to the impairment caused by non-service-connected disabilities. 38 C.F.R. §§ 3.341, 4.16, 4.19.

As the preponderance of the evidence is against a finding that the Veteran is unemployable solely as the result of his service- connected disability, the Board finds that entitlement to a total disability rating based on individual unemployability, on a schedular or extraschedular basis, is not warranted.

In making these determinations, the Board has considered the provisions of 38 U.S.C.A. § 5107(b), but there is not such a state of approximate balance of the positive evidence with the negative evidence to otherwise warrant a favorable decision.


ORDER

Service connection for an acquired psychiatric disorder is denied.

Service connection for a right shoulder disorder is denied.

Service connection for a right foot disorder is denied.

Service connection for a disability manifested by numbness in the hands is denied.

Service connection for residuals of a concussion, claimed as traumatic brain injury (TBI), and including headaches, is denied.

A total disability rating based on individual unemployability (TDIU) is denied.




______________________________________________
Vito A. Clementi
Veterans Law Judge, Board of Veterans' Appeals


Department of Veterans Affairs